# EXHIBIT A

## AFFIDAVIT OF WILLIAM ALSTON

I was employed at FCI McKean UNICOR from March 2001 through March 2002. I was the lead Panel Saw operator who cut all of the Micore/Tac-boards and the laminate that covered particle boards for the day shift. I was instructed and allowed to cut these micore boards in stacks of four (4), if a schematic called for smaller pieces to be cut, I could put 2 stacks of 4 side by side. this created a lot of dust. I was never given a respirator or told how to get one. I was given a Breathe Easy Dust mask, which does not protect against the Silica in Micoreboards.

I have had dust all over myself and seen it all over other in-mates. The panel saw I operated contained a small dust trap which jammed up on numerous occassions at which times I was instructed and allowed to use a air hose to clear the trap by my supervisor, Mr. James Perrotti. The air hose I used maintained a 100 PSI. I was instructed and allowed to use the air hose to clear my saw's blade while cutting boards, while cleaning the floor, while blow-ing down the machines and to get dust off of my clothes, face and out of my hair(all under the direction of my supervisor James Perrotti). Mr. Perrotti when asked the question of why he would never come in my vicinity while my machine was in operation or whether Micorboards were harmful to my health, he directly told me that the dust mask was all the protection I needed.

I went to medical for a chest X-ray on or around March 20, 2002. Spots were discovered on my lungs and soon after this, I was abrubtly transferred.

On 1/30/07 a Chest X-ray revealed Bronchitis which the medical staff at Petersburg FCC believes is a result of my handling the Silica filled materials at FCI McKean UNICOR.

I swear under the penalty of perjury that the above statements are true and correct to the best of my knowledge.

_William Alston_
William Alston

A-1

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA

WILLIAM ALSTON

      Plaintiff,

      v.

DEBRA FORSYTH, ET AL.,
      Defendants.

CIVIL ACTION NO.
05-168E

JUDGE McLAUGHLIN

MAGISTRATE JUDGE BAXTER

## DECLARATION OF WILLIAM ALSTON

WILLIAM ALSTON declares under penalty of perjury:

1. I am the plaintiff in the above captioned civil-action. I was a UNICOR employee at FCI McKean from March 2001 through March 2002.

2. As a result of working in this factory, I suffer several health related injuries but I never knew that UNICOR was the source while I was still working there.

3. My immediate supervisor James Perrotti, assured me that I was safe from any danger of the materials that I would cut as long as I wore a dust mask and I believed him.

4. It was not until 2004, after a medical consultation, while at another prison that I found out that the dust mask issued in McKean's UNICOR did not protect against Silica (an ingredient in the boards I cut regularly), nor toxic fumes & dust.

5. It was then that I discovered that Mr. Perrotti had misinformed me and I made the connection of my injuries to the materials used in McKean's UNICOR Factory.

     Pursuant to 28 U.S.C. §1746, I declare under penalty of pejury that the foregoing is true and correct.

                          *William Alston*
                          William Alston

                         10/24/07
                          DATE

AFFIDAVIT OF KENNY HILL

I, Kenny Hill, swear under the penalty of perjury that the following is true and correct.

I arrived at FCC Petersburg from FCI McKean in 2004. William Alston told me that he was having health problems. I told him that he should go to health services and be checked for Silicosis and to find out if his health problems were related to the work he performed in FCI McKean's UNICOR. Weeks later, Mr.Alston told me that after being examined by medical staff, they confirmed that his health issues could be directly linked to his job at FCI McKean.

William Alston told me that he never knew that his illnesses were connected to his work at FCI McKean until after the medical consultation in 2004. He said his supervisor at Fci McKean's UNICOR, James Perrotti, assured him that his dust mask protected him from airbourne  dust hazards and he trusted him.

Sworn to before me this
24th day of Sept , 2007

_____
Notary Public
285673

MY COMMISSION EXPIRES
29 FEBRUARY 2008

_____
Kenny Hill

A-3

AFFIDAVIT OF MYRON WARD

I, Myron Ward, swear under penalty of perjury that the following is true and correct.

I was a UNICOR employee at FCI McKean from April 2002 - October 2003. My immediate supervisor was Mr. Robin Bevevino. In early April 2003 I asked Mr. Bevevino if the material that we were routing was dangerous because one of the workers that usually works another shift had on a full face respirator and no one else did. He told me that the tac-board/micore boards, that we worked with regularly, was cancerous when lots of dust is created like it was at that time and many others. He informed me that his health has been affected by the dust from these boards and he had filed a complaint with his union. All of this was made known to Marty Sapko, Dave English, and Steven Housler. He also let me know that this was not the first time a complaint was made about the dust being created from the boards cut in the factory and its hazards. More than a year before April of 2003, he and others complained about all of the dust that was being created from the boards cut in the factory and that it could cause cancer with out a respirator. He said all of the persons mentioned above knew of the complaints and were part of the investigation.

Mr. Bevevino told me that in 2001 an air quality test was done in the factory by Microbacs which was manipulated by Mike Salerno and other staff. They told them where to set up and test,(mostly in areas where machines that were usually being used were not this day). They fixed the test so that there would be as little hazardous dust in the air as possible.

Sworn to before me this
24th day of Sept., 2007

_____
Notary Public

_____
Myron Ward

A-4

# EXHIBIT B

NSN 7540-00-634-4176

AUTHORIZED FOR LOCAL REPRODUCTION

| MEDICAL RECORD | CHRONOLOGICAL RECORD OF MEDICAL CARE |
|---|---|
| DATE | SYMPTOMS, DIAGNOSIS, TREATMENT  TREATING ORGANIZATION (Sign each entry) |

11/14/01    Abnormal CXR

111D bn    S) 42 yoo → non smoker, Hx ⊕ PPD Tx INH x Como

no fevers nowgt loss, no cough, no fevers

His CXR of 10/27/01 showed a nodular area

Ⓡ lower lung zone. To me it appears 1cm

in diameter & is in the area of scattered

calcifications. Not seen on previous CXR

FHx - father - lung Cancer

O)  T 974  Bp 110/70  P60  R14

looks healthy

Htent neg - no adenopathy

chest clear bilaterally

heart ⊖⊖

Abd- no organomegally

A)    RLL nodular density on CXR

no symptoms

P)    Sputum cytology x 3

Repeat CXR   1 mo

Patient educated & understands diagnostic

possibilities & need for W/U   [signature]

| HOSPITAL OR MEDICAL FACILITY | STATUS | DEPART./SERVICE | RECORDS MAINTAINED AT |
|---|---|---|---|
| | | H. PHAM, MD FCI MCKEAN | P Beam, MD FCI McKean |

| SPONSOR'S NAME | SSN/ID NO. | RELATIONSHIP TO SPONSOR |
|---|---|---|
| ALSTON, WILLIAM | | |

PATIENT'S IDENTIFICATION: (For typed or written entries, give: Name - last, first, middle; ID No or SSN; Sex;
Date of Birth; Rank/Grade.)

REGISTER NO.
07273-016

BP-S148.055 **INMATE REQUEST TO STAFF** CDFRM
SEP 98
**U.S. DEPARTMENT OF JUSTICE**                    **FEDERAL BUREAU OF PRISONS**

| TO: (Name and Title of Staff Member) | DATE: |
|---|---|
| Medical Records | 5/28/02 |
| FROM: William Alston | REGISTER NO.: 07273-016 |
| WORK ASSIGNMENT: Pm Landscape | UNIT: Richmond Hall #3 |

SUBJECT: (Briefly state your question or concern and the solution you are requesting.
Continue on back, if necessary.  Your failure to be specific may result in no action being
taken.  If necessary, you will be interviewed in order to successfully respond to your
request.)

I respectfully request to know the
results of the M.R.I. I took
at FCI McKean prior to coming to
FCI Petersburg

"Thanking You"

William Alst
07273-016

(Do not write below this line)

DISPOSITION:

You are on the list to
recieve your request.

B-2

| Signature Staff Member | Date |
|---|---|
| KO~ | 9/9/02 |

Record Copy - File; Copy - Inmate
(This form may be replicated via WP)                This form replaces BP-148.070 dated Oct 86
                                                   and BP-S148.070 APR 94

B-2     Health Services Unit-LOW

.S. DEPARTMENT OF JUSTICE                    INMATE REQUEST TO STAFF MEMBER
·deral Bureau of Prisons

DATE _____

⊃:   Dr. Laburn
                    (Name and title of officer)

JBJECT: State completely but briefly the problem on which you desire assistance, and what you think should be done (Give details).

   This is a follow-up to the conversation we had.  I respectfully request a CT scan and
blood work.  The reason for my request is, at the prior federal institution, I worked in
UNICORE as a panel saw operator cutting partical board material for 14 months.  Presently
I am experiencing health problems: itching and difficulty in breathing.  I normally get
a chest x-ray annually because of my exposure to TB.  During on of those annual x-rays
at FCI McKean the doctor discovered a spot on my lung; however, he was not able to
follow this up because I was transferred to this institution.  After arriving at this

institution, I was eventually given a x-ray which turned up nothing.  I know my body,

                    (Use other side of page if more space is needed)

something is wrong -itching and difficulty in breathing.  As so the x-ray may not be
revealing the problem.  According I am requesting that a CT scan be conducted.

*your chest x rays have been normal for
the past 4 years - so CT scan is not
indicated. Your evaluation for "problems breathing"
was normal. Follow up in sick call if symptoms
persist.*

AME:   William Alston                                              No.:  07273-016

·ork assignment: _____                    Unit: _____

JTE: If you follow instructions in preparing your request, it can be disposed of more promptly and intelligently  You will be interviewed, if necessary, in order to
isfactorily handle your request. Your failure to specifically state your problem may result in no action being taken.

ISPOSITION: (Do not write in this space)                    DATE ___11-3-04___

                    ( *see above* )

                            B-3

                                                            Officer

BP-S622.060    **RADIOLOGIC CONSULTATION REQUEST/REPORT**  CDFRM
AUG 96

**U.S. DEPARTMENT OF JUSTICE**                                    **FEDERAL BUREAU OF PRISONS**

| Patient Identification<br>Name, Register Number, Institution<br><br>Alston, William<br><br>07273-016<br><br>FCC - Petersburg  (LOW) | Age<br><br>45 | Sex<br><br>M | EXAMINATION REQUESTED<br><br>Chest - 1v (71010) |
|---|---|---|---|
| | Pregnant<br><br>____ Yes    X ___ No | | |
| | Requested by<br><br>Katherine A. Laybourn, M.D. | | Date Requested<br><br>8-6-03 |

Specific reason(s) for request (Complaints and findings)

Yearly CXR, H/O +PPD

| Date of examination<br><br>8-13-03 | Date of Report<br><br>8-15-03 | Date of Transcription | Film # |
|---|---|---|---|

Radiologic Report

**Exam: PA Chest**

**Conclusion: Stable, normal chest.**

**Findings:  The heart, lungs, and bony thorax are normal, unchanged from 7 Aug 02.**

Dr. K. Laybourn
Medical Officer
FCC Petersburg, Virginia

| Signature<br><br>*William B. Olson, m.d.*<br>William B. Olson, M.D. | Location of Radiologic Facility<br><br>DBI Radiology, Inc.<br>Franklin, Virginia 23851-1205 |
|---|---|

Original - Medical Record; Copy - Physician; Copy - Radiology

(This form may be replicated via WP)

B-4

BP-S622.060    **RADIOLOGIC CONSULTATION REQUEST/REPORT**  CDFRM
AUG 96

**U.S. DEPARTMENT OF JUSTICE**                              **FEDERAL BUREAU OF PRISONS**

| Patient Identification | Age | Sex | EXAMINATION REQUESTED |
|---|---|---|---|
| Name, Register Number, Institution | 46 | M | |
| Alston, William | | | Chest - 1v (71010) |

| Pregnant | | |
|---|---|---|
| ___Yes  X No | | |

| Requested by | Date Requested |
|---|---|
| Katherine A. Laybourn, M.D. | 8-5-04 |

07273-016

FCC - Petersburg (LOW)

Specific reason(s) for request (Complaints and findings)

Yearly CXR, H/O Latent TB.

| Date of examination | Date of Report | Date of Transcription | Film # |
|---|---|---|---|
| 8-6-04 | 8-17-04 | | |

Radiologic Report

**Exam:** PA Chest.

**Conclusion:** Normal chest.

**Findings:** The heart, lungs, and bony thorax are normal.

_K.A. Laybourn, M.D._
8/27/04

| Signature | Location of Radiologic Facility |
|---|---|
| William B. Olson, M.D. | **DBI Radiology, Inc.** |
| | Franklin, Virginia 23851-1205 |

Original - Medical Record; Copy - Physician; Copy - Radiology
(This form may be replicated via WP)

B–5

BP-S622.060    **RADIOLOGIC CONSULTATION REQUEST/REPORT**   CDFRM
AUG 96
**U.S. DEPARTMENT OF JUSTICE**                                                   **FEDERAL BUREAU OF PRISONS**

| Patient Identification Name, Register Number, Institution | Age 47 | Sex M | EXAMINATION REQUESTED |
|---|---|---|---|
| Alston, William | | | Chest- 2v (71020) |
| 07273-016 | Pregnant ___ Yes  X No | | |

| | Requested by Katherine A. Laybourn, M.D. | Date Requested 1-30-07 |
|---|---|---|
| FCC - Petersburg (LOW) | | |

Specific reason(s) for request (Complaints and findings)

   Dypsnea.  Asbestos exposure.

| Date of examination 1-30-07 | Date of Report 2-9-07 | Date of Transcription | Film # |
|---|---|---|---|

Radiologic Report

Exam:  PA & Lat. Chest.

Conclusion:  Bronchitis.

Findings:  The heart and bony thorax are normal.  There is diffuse peribronchial thickening.
The lungs are otherwise unremarkable.   Incidental note is made of a right sided C7
cervical rib.  The bronchitis is a new finding since the 6 Aug 04 exam.

| Signature  *William B. Olson, MD* William B. Olson, M.D. | Location of Radiologic Facility **DBI Radiology, Inc.** Franklin, Virginia 23851-1205 |
|---|---|

Original - Medical Record; Copy - Physician; Copy - Radiology

(This form may be replicated via WP)

B–6

Dr. Laybourn
Staff Physician
FCC Petersburg, VA
2-14-07

B-6

**EXHIBIT C**



## MATTHEW W. PSILLAS INVESTIGATIONS

1903 W. 8TH ST.
#175
ERIE, PA 16505

Phone (814)864-2038
Fax    (775) 310-9679
email:  matthewpsi@verizon.net
www.psillas.net

William Alston # 07273-016
FCC Petersburg Low
P.O. Box 1000
Petersburg, VA  23804

September 27, 2007

**RE: ROBIN BEVEVINO**

Dear Mr. Alston,

     Enclosed is a copy of the tape recorded interview with Mr. Robin Bevevino.  After the tape stopped rolling, Mr. Bevevino added the following:  The maintenance foreman, MIKE SALERANO,  hand wrote over safety sheets and the first shift received respirators and notes requesting they only do certain pallets of jobs. Mr. Bevevino also added he knew for certain the dust collection machines were not cleaned as they should have been.

I hope this letter and transcript are received by you prior to your court date. Please let me know you have received them.

     Please contact me with any questions.

Sincerely,

Matthew W. Psillas

**MATTHEW PSILLAS**
**Private Investigator**
**1903 West 8th St. #175**
**Erie, PA 16505**


Client:        William Alston


Date of Interview:        Tuesday, September 25, 2007


Mr. Robin Bevevino
605 Stanton Hill Road
Russell, PA


MP:    This is Matthew Psillas.  Today is September 25, 2007.  The time is 4:00 p.m.
I'm at 605 Stanton Hill Road, Russell, PA and I'm with Mr. Robin Bevevino.  Mr.
Bevevino, do you understand that this, ah, interview is being taped?

RB:    Yes.

MP:    And would you please spell your first and last name.

RB:    R O B I N.  B E V E V I N O.

MP:    Do I have your address correct as 605 Stanton Hill…

RB:    Yes, sir.

MP:    …Russell, PA?  Your date of birth?

RB:    07/18/56.

MP:    I'm working for Mr. Alston and Mr. Alston has prepared, ah, some questions for
you regarding, ah, Unicore.  You understand that this interview is regarding that?

RB:    Yes.

MP:    First question.  When did you first find out the material microboard contained
silica dust?

RB:    Um, at least I'd say three to four months prior to, ah, ah, shit hitting the fan.  I
should probably, ah, I shouldn't swear.

MP:     That's all right. Three or four months before there was a problem when…

RB:     Well…

MP:     …approximately when?

RB:     …there, there was a problem but like I said, um, we worked on trying to resolve some of the issues and we had the union president along with safety manager and superintendent of industry, um, the captain or lieutenant would come down also but. The majority of stuff was addressed but nothing was really ever done about it.

MP:     Okay. So when do you, when was the issue brought, ah, to, to knowledge then?

RB:     I, I.

MP:     To get a time frame for the three or four months before?

RB:     Yeah, I, I would have to say, you know, I, it's tough on me to re, you know.

MP:     _____ sure.

RB:     …recall exactly.

MP:     Exactly, you know. Approximately what, what month and year then?

RB:     I would say 2004. Um, probably the beginning of, you know, like January, February.

MP:     January, February. Okay.

RB:     I'm guessing or estimating.

MP:     That's perfect. When did you report to your union representative that you had been harmed by the materials being cut at Unicore.

RB:     Ah, I don't know as much as being harmed as the fact that just breathing the dust and the, you know, ah, stuff being blown around and breathing it, inhaling it.

MP:     So it was, was it the beginning of 2004 or the three or four months before that?

RB:     Oh, I would, it, it's actually, it was going on for years. No one had the knowledge or, you know, ever looked into what, MSDS Sheets or Material Data Safety. And we started, you know, I started looking stuff up on my own. Ah, I was having respiratory problems and severe like sinus and, ah, you know, actually was allergic to, you know, had allergies. I, I believe to it.

2

MP:    So this was the entire time that you were working with the micro, microboard…

RB:    Yes. Silica dust.

MP:    …silica dust?  Okay.

RB:    Yep.

MP:    So it was, it was actually years then prior to any alert that there may be a problem with this material?

RB:    Yes.

MP:    Did your union investigate your claim as part of the investigation, um, regarding Steve Housler, Marty Satco?  Did, did the union investigate the claims that you had?

RB:    Hmm, hmm.

MP:    What did they, what did they do?

RB:    Union president, ah…

MP:    Okay.

RB:    ..I, I gave me him information on what we were breathing, what parts of the factory to look for stuff.  Um.

MP:    What was the union president's name?

RB:    Rich Youchivan (spelling).

MP:    Okay.  Youchivan.

RB:    Yeah.  Something like that.  It's Y O U C H I something.

MP:    Okay. Youchivan.  And he was the union president at that time and.

RB:    Hmm, hmm.

MP:    ..ah, well prior to 2004 for certain?

RB:    Yep.

3

MP:     Okay.  Was it well known amongst the rest of the staff that Unicore, that the microboard dust was hazardous?

RB:     Ah, not until, ah, like OSHA came in or just prior to OSHA coming in.

MP:     Okay.  Do you remember approximately when OSHA came in?

RB:     Um, that would be, I'd have to, I, I'm gonna, I'm gonna say March or April.

MP:     March or April of 2004.  Okay.

RB:     I, I believe.

MP:     All right.  Have you ever notice the silica or particle board dust, ah, becoming and remaining airborne for a period of time?

RB:     Oh, yes.

MP:     When machined?

RB:     Yep.

MP:     Okay.

RB:     Yep.

MP:     Were there dust collection systems?

RB:     Yes.

MP:     And even with those dust collection systems, you still.

RB:     Were not, they, they weren't strong enough, drawing enough air to suck the dust, you know.

MP:     No doubt, no doubt in your mind that you could see?

RB:     Oh, yeah.

MP:     Okay.

RB:     Um, it supposed to be, um, it supposed to be cut with a chop blade.

MP:     Hmm, hmm.

RB:    And they were using, ah, regular saw blade which creates even more dust, fires. And then it, it's such nasty stuff that the inmates that were cutting it actually stood there with, ah, air nozzles and blew it so they weren't breathing it which, you know, sent it.

MP:    More airborne?

RB:    Oh, yeah. And we then probably had like I'd say 10 fans half the size of your vehicle...

MP:    Okay.

RB:    ...that, you know, just circulated or blew air. Well, you know, 'cause we didn't have air conditioning. So I mean that second shift like a day like today, it could almost be 100 in there, and you know. Everybody's blowing, you know, and those fans are blowing and just all this was just shifted, you know. Everybody was breathing it in.

MP:    Everybody was breathing that silica...

RB:    Hmm, hmm.

MP:    The inmates then were using air nozzles you said, air compressors to get the dust away from where they were working at?

RB:    Their area, yeah. Right. And blowing it like to another area and then they would basically blow it, you know, back and (laughs)...

MP:    Okay.

RB:    ...in that direction.

MP:    So the dust collection systems were not useful in picking up that dust?

RB:    Yeah, they, they set up a couple machines. Well, ah, the perfect example would be, ah, a shop vac...

MP:    Hmm, hmm.

RB:    ...that you would have in your home maybe even.

MP:    Sure.

RB:    Not very big.

MP:    Right.

5

RB:    You know.

MP:    Right.

RB:    You know.  Three foot high maybe, two foot around or whatever.  Ah, they had that hooked up to one of the machines that they were operating which was ridiculous.  It couldn't handle, you know, sucking that dust up.

MP:    Have you ever talked to Steven Housler about the hazards of the dust?

RB:    Oh.

MP:    Prior to, prior to April of 2003.

RB:    No.

MP:    No.  Afterwards though?

RB:    Yeah.

MP:    Okay.

RB:    He really didn't want to talk, you know what I mean, to me whatsoever.

MP:    What was his title or his position?

RB:    Safety  manager.

MP:    Okay.  Have you ever talked to Marty Satco about the hazards of the board dust prior to April of 2003?

RB:    (No audible response).

MP:    He you did?  What was his title or his, his..

RB:    Um, factory manager.

MP:    Okay.

RB:    At the time.

MP:    Did he do anything about it or, or…

RB:    No.

MP:     ...express the same concerns?

RB:     Listen and like always and basically no reaction.

MP:     Okay.

RB:     My superintendent, everything shouldn't be pointed at Satco either. Our superintendent was Debbie Forsyth.

MP:     Okay.

RB:     She even, you know, walked around with, with the OSHA _____ and the safety manager. She would promise to do things and nothing got done.

MP:     And you said her title was?

RB:     Superintendent.

MP:     So worried about images.

RB:     Hmm, hmm.

MP:     Those were the questions that, ah, Mr., ah, Alston wanted to know specifically. Is there anything else that you'd like to add? That's what he was specifically interested in. Is there anything else you to add?

RB:     Oh, yeah.

MP:     This is, this is your opportunity.

RB:     I mean you can let him know, um, we were breathing, ah, a red glue that would, that had the, you know, the MSDS sheets on that had respiratory failure. And skin and eye irritation.

MP:     Okay.

RB:     Is that dangerous actually. It was highly flammable liquid and it was sprayed and once it went through the spray booth and went into a heat tunnel. As it comes out the heat tunnel, you can stand back, you know how you look at the road and see a mir, like a mirage from the heat coming up off the blacktop?

MP:     Yes.

RB:     You can actually see the vapors when it would come out through the heat tunnel prior to us putting a sheet on top of a board and you can actually see the, the vapors and stuff coming out of the machine.

MP:    Okay.

RB:    Also, um, the for, um, the particleboard itself, it's got formaldehyde.

MP:    Okay.

RB:    And, ah, you know, you know different. You know 'cause all it is is dust, you know, in, in a, you know, put them together and make like quicksand and then they, somehow they pour it, and then they dry it. It's just, you know, just breathing it, and inhaling that stuff, you know. It, it has to be well ventilated area. Ah, and drilling it, you know, routing it, and then shaping it, stuff like that was the same thing. Blowing it all over, you know, and breathing it. Again, the same kind of, but, it's a little bit heavier when, you know. It wouldn't fly and float as much as the microboard but.

MP:    It wasn't quite as airborne?

RB:    Right.

MP:    But it's still, it still…

RB:    It's still

MP:    You're still breathing it.

RB:    Yep.

MP:    Ah, knowing that you, you told Debbie Forsythe about the different problems, ah, that would be at approximately sometime before the beginning of 2004, do you know when it was brought to her attention that you know that she knew for certain?

RB:    I would have to say around December maybe.

MP:    December right before the beginning of the year then. So December of 03.

RB:    Probably 03, yeah.

MP:    Okay.

RB:    I mean stuff was covered up, you know. Ah, in my, in my estimation and time, I mean inmates in, in the first shift, I worked second shift.

MP:    Hmm, hmm.

RB:     I mean came to me and told me that they had a meeting upstairs amongst all staff
        members but for some reason I wasn't included in the meeting.

MP:     And what was your title?

RB:     Ah, ah, woodworking foreman.

MP:     Woodworking foreman.

RB:     Hmm, hmm.

MP:     So you, you believe you should have been involved in those meetings?

RB:     Oh, yes.

MP:     Because you were woodworking foreman. That was...

RB:     That and the union...

MP:     ...that was perfectly normal?

RB:     ...union steward, yes.

MP:     Okay.

RB:     And then these inmates told me and, ah, quite a few staff members also _____
        also mentioned, um, that basically she threatened everybody by telling them that
        if we have to put hundreds of thousands of dollars into this dust collection and
        everything that was going on, it, that they might shut Unicore down and they
        won't have a job. To me that's like a threat. You know, threatening other staff
        members that if you got involved or said anything, you know, just 'cause one or
        two were doesn't, you know. Said if anybody ganged up that there was a chance
        but that's not true. I mean if there's problems, should be fixed and taken care of
        no matter what the cost is.

MP:     Right.

RB:     You know.

MP:     Where, did you feel you have any specific health problems from breathing that in
        still today?

RB:     Ah, the only thing I could tell you is my respiratory and sinus infections aren't
        nearly, you know. I have them very rare compared to when, when I was there.

MP:     When you were there, the health problems were significantly more?

RB:   Oh, yeah. Yep. Probably, I worked eight years in food service. I mean, think of how many in, 12, 1300 inmates coming through the line every day spitting, coughing and stuff. And virtually never was sick. After being in the factory after a period of time constantly respiratory and sinus infections.

MP:   And how long did you work there?

RB:   Oh, almost seven…

MP:   From what years.

RB:   … seven years.

MP:   Seven years. From what year approximately?

RB:   I would say, ah, probably from, um, 90. Let's see when was that. I can't actually, I can't pinpoint. I'd say around, you know, um, 1999 or 2000.

MP:   Okay.

RB:   And this was something that they would knew. You know what I'm saying. That it was just, we walked in the factory just like guys ahead of us and they knew better than to do what they were doing. You know. But like, um, he should mention in there also that, ah, and I'm very sad about that too is, um, they altered, ah, the MSDS sheet.

MP:   Do you know who specifically did?

RB:   No. I have a good idea though.

MP:   And MSD sheet.

RB:   The one, the one that, all I'll say is whoever is supposed to handle the MSDS sheets, that did them.

MP:   Hmm, hmm.

RB:   Is probably the one that. They actually for the microboard, there was a line drawn. And these guys saw it too, some of the inmates. There was a line drawn through where it said respirator.

MP:   Hmm, hmm.

RB:   You're never supposed to touch, you don't touch the MSDS sheet but they put a black, you know, magic marker line through. And you can still read respirator.

Right beside it, they drew a picture of a dust mask and said dust mask. Now as soon as OSHA come, they put it back on. OSHA left, they took it back off. I, you know, I have documentation and photos of the.

MP:    You do.

RB:    Oh, yeah.

MP:    Oh, you have that?

RB:    Hmm, hmm.

MP:    Okay.

RB:    I have a book about that big.

MP:    Okay. About, about a five inch, ah, five inch book on all this material?

RB:    Hmm, hmm. You know, to try to, you know, protect myself too, you know, in the process.

MP:    Sure. Sure.

RB:    Yep.

MP:    Okay. That, ah, finishes the questions, ah, from me. Ah, Mr. Bevevino, do you understand that this interview, ah, was tape recorded?

RB:    Yes.

MP:    All right. The time is 4:50. Again, this is Matthew Psillas on September 25, 2007.

END OF INTERVIEW

# MATTHEW W. PSILLAS INVESTIGATIONS

1903 W. 8th. St.
Suite #175
Erie, Pa 16505

Phone (814) 864-2038
email- matthewpsi@verizon.net

## AFFIDAVIT OF INTERVIEW

Date of Interview, Tuesday, September 25, 2007

I, Matthew W. Psillas, of Matthew W. Psillas Investigations, being duly sworn depose and say that on Tuesday, September 25th at 4:00 PM I conducted the attached 11 page tape recorded interview with Mr. Robin Bevevino at 605 Stanton Hill, Russell, PA.

I do certify that I have no interest in the above action and that I am over the age of eighteen years.

Sworn and subscribed to
before me on the __16__ day
of October, 2007 by the affiant,
who is known to me.

Matthew W. Psillas
Matthew W. Psillas Investigation
1903 W. 8th St. # 175
Erie, Pennsylvania 16505
814 864 2038

NOTARIAL SEAL
Raemarie T. Kovaly, Notary Public
Erie, Erie County
My commission expires August 3, 2008

William Alston #07273-016
FCC Petersburg Low
P.O. Box 1000
Petersburg, VA 23804

Dear Honorable Judge Baxter,

I pray this letter finds you well. I apologize if this letter is unorthodox or ill-advised but there are somethings I want to say that I do not think comes through clearly in legal briefs.

First off your Honor I have little education. I do not ask for pity, only the chance to be heard and dealt with fairly. All of my legal briefs and replies to the defendants motions are done by other inmates after I tell them the facts surrounding my case and they put it in legal terms. I am often confused with the end result.

When I read your reasoning for not appointing me a lawyer, yet your willingness to look at my responses in lay-mens terms, I thought this would be as good a time as any to put on paper in my own words my side of the story. This goes along with the legal brief that was prepared for me that accompanies this letter and is intended as my response to the government's Motion to Dismiss and not this letter.

Your Honor, I will only address the (2) issues the defendants raised in there Motion to Dismiss and I will keep it brief.

Number (1), The government says I should be time barred because I could have found out sooner about the hazards of the materials I was cutting in FCI McKean being related to my health problems. How could I have possibly done that? Everyone of the defendants are (BOP) staff and they are saying they did not know. My immediate supervisor, James Perrotti, told me my dust mask was all the protection I needed and I believed him. More importantly, I trusted him. When you look at my legal brief you will see where I followed up on the MRI test at McKean by trying to get the results after I was abruptly transferred to FCC Petersburg. Then look at my request at medical dated 11/3/04 where I requested a CT Scan. In the clinic's response they said my x-rays had been clear for the last 4 years. It was not until shortly after that and after medical consultation that the connection between my health problems and my work at McKean was confirmed and (6) months later my brief was filed.

Number (2), the defendants say I would be bringing the same set of circumstances as the plaintiffs who preceded me. Your Honor, no-thing could be further from the truth. As you can see from the report

of a private investigator, the defendants under oath at deposition lied to the Court. P.I. Matthew Psillas tracked down a witness who was not allowed to testify at the depositions, Mr. Robin Bevevino. Mr. Bevevino's interview uncovers the deception and the level it went to. He exposes how the air test and the MSDS were manipulated and who was responsible. Mr. Bevevino was a supervisor at FCI McKean when everything was taking place. I am sure after reading his words and seeing the deception of the defendants, the Court is extremely upset. His testimony was not available to the previous plaintiffs, which alone separates my situation from theirs.

Thank you Your Honor for at least reading my words. Once again, I humbly apologize if it is unorthodox.

Respectfully Submitted,

William Alston

William Alston #07273-016

CC: U.S. Attorney

-2-